

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 3, 2013**

_____
**United States Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| THOMAS AIGNER, | § | |
|     PETITIONING CREDITOR | § | |
| | § | |
| v. | § | CASE NO. 11-47029-DML-7 |
| | § | |
| HARRY NEAL MCMILLAN, | § | |
|     ALLEGED DEBTOR. | § | |

## MEMORANDUM OPINION

Before the court is an involuntary petition for relief under chapter 7 of the Bankruptcy Code[1] (the "Petition," at docket no.[2] 1)[3] filed by Thomas Aigner ("Petitioner") against alleged debtor Harry Neal McMillan ("McMillan") pursuant to section 303 of the Code. Also before the court is McMillan's counterclaim against Petitioner for costs, fees, and actual and punitive

---

[1] 11 U.S.C. §§ 101 *et seq*. (the "Code").

[2] "Docket no." shall hereinafter refer to the corresponding docket entry in the above-captioned bankruptcy case (the "Case").

[3] Petitioner filed the Petition on December 21, 2011. Petitioner amended the Petition on February 2, 2012 to add Fusion Labs, Inc. as an additional petitioning creditor. *See* docket no. 16. Fusion Labs, Inc. withdrew as a petitioning creditor pursuant to this court's March 20, 2012 order at docket no. 21.

1

damages pursuant to Code section 303(i) (the "Counterclaim"). *See Answer to Involuntary Petition and Counterclaim*, docket no. 11, at 7-8.

The court held hearings on the Petition and the Counterclaim (the "Hearings") over the course of nine non-consecutive days.[4] At the Hearings, the court admitted exhibits into evidence[5] and heard testimony from McMillan, Petitioner, Ronald Cresswell, Gary Rowan, and Donal Schmidt ("Schmidt"), chairman of Sun River (defined below). The court also admitted telephonic deposition testimony of Ronald G. Papa taken on Petitioner's behalf. *See* Petitioner's Ex. 18.

For the reasons described below, Federal Rule of Bankruptcy Procedure[6] 1003(a) disqualifies Petitioner from commencing an involuntary bankruptcy case against McMillan. As a result, the Petition will be dismissed. However, the court finds that Petitioner did not file the Petition in bad faith. The Counterclaim is therefore dismissed to the limited extent that it requests damages under Code section 303(i)(2). The court will retain jurisdiction over the Case solely to determine whether McMillan is entitled to costs and fees under Code section 303(i)(1).[7]

The court exercises jurisdiction over this contested involuntary petition pursuant to 28 U.S.C. §§ 1334 and 157. This memorandum opinion constitutes the court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052, 1018.

---

[4] The Hearings took place on August 6, 2012; August 7, 2012; October 15, 2012; October 17, 2012; December 10, 2012; February 20, 2013; February 21, 2013; March 20, 2013; and April 8, 2013.

[5] For a list of exhibits admitted into evidence, see docket no. 68. Exhibits will hereinafter be cited as "_____'s Exhibit *n*," where _____ signifies the party that introduced the exhibit and *n* signifies the exhibit number.

[6] Hereinafter "Rule," "Rules," or "FED. R. BANKR. P.," as appropriate.

[7] Sun River (as defined below) commenced an adversary proceeding in this court (Adversary No. 12-4012-dml) against McMillan within the Case. The court will not retain jurisdiction over that adversary proceeding, which will be dismissed by separate order.

## I. BACKGROUND

At bottom, the Case is but another battle in an ongoing war between McMillan and a small publicly-traded corporation named Sun River Energy, Inc. ("Sun River") to which McMillan provided certain consulting services. Because the court ultimately concludes that Petitioner is disqualified from bringing the Petition, the court need not recount this battle's tortured history in its entirety. The court, however, received sufficient testimony at the Hearings from Petitioner, McMillan, and Schmidt to be confident that the Case was commenced principally at the instance of Sun River as a tactical measure in its disputes with McMillan.

### A. The Judgment

Petitioner obtained a final default judgment (the "Judgment," at Petitioner Ex. 8) against McMillan from the 298th Judicial District Court of Dallas County, Texas (the "State Court") in October 1999. By 2011, the Judgment, which Petitioner had not collected, had gone dormant. However, the State Court granted Petitioner a *Writ of Scire Facias to Revive Dormant Judgment Against Debtor*, which revived the Judgment. *See* McMillan Ex. 54. The parties do not dispute that McMillan currently owes a debt of approximately three million dollars to Petitioner based on the Judgment.[8]

---

[8] *See Joint Pretrial Order*, docket no. 40, at 6.

The record indicates that Petitioner entered into an agreement with Mirador Consulting, Inc. ("Mirador") on June 6, 2011, whereby Mirador received a partial interest in the Judgment such that Petitioner and Mirador each owned an undivided interest in the Judgment. This fact, which the court mentions here only for the sake of completeness, does not alter the court's ultimate conclusion that Rule 1003(a) disqualifies Petitioner from bringing the Petition. *See* Section II.C. below.

*B. The Dispute with Sun River*

Though the court need not describe McMillan's disputes with Sun River in detail, a brief summary of them is necessary. McMillan became acquainted with Sun River sometime around 2008. Sun River owns and then owned substantial mineral rights in New Mexico. Sun River retained McMillan in connection with its plan to become a regularly traded public company. McMillan, who was compensated by transfer to entities he controlled of stock and warrants, was, at one point, Sun River's largest shareholder.

Several years later, in order to shore up the company, Sun River, with McMillan's support, brought in Schmidt as Sun River's new CEO and Thimothy Wafford ("Wafford") as CFO, based on their experience with oil and gas exploration and development. Soon thereafter, however, Schmidt and Wafford on the one hand and McMillan on the other found themselves increasingly at odds. Their differences included unsuccessful resource development, relations with investors, director elections, the question of responsibility for certain securities law problems, and an unsuccessful effort to list Sun River on the NASDAQ. In December of 2011, following a meeting between Schmidt and McMillan, relations broke down completely.

*C. The Agreement*

On December 16, 2011, Petitioner entered into a Joint Prosecution Agreement (the "Agreement," at McMillan Ex. 58) with Schmidt and Wafford. The Agreement, which is set forth in relevant part as follows, purports to grant Schmidt and Wafford a degree of authority and responsibility to pursue an involuntary bankruptcy action in Petitioner's name against McMillan in exchange for an interest in the Judgment:

2) [Petitioner] agrees to file an involuntary bankruptcy action against [McMillan] under the [Code] and agrees to cooperate in the prosecution of the same . . .

3) The parties [to the Agreement] agree to jointly prosecute any claims they may have against [McMillan] . . .

4) [Schmidt and Wafford] shall have sole authority to select [b]ankruptcy counsel and control the prosecution of [Petitioner's] claims in the [Case]. However, [Petitioner] retains the right to make any decisions regarding settlement of [Petitioner's] claims . . .

6) [Schmidt and Wafford] agree[] to pay the reasonable and necessary costs and fees, including legal fees, associated with the prosecution of [Petitioner's] claims in [the Case]. From the proceeds of any potential recovery, [Schmidt and Wafford] shall be entitled to reimbursement of all costs and fees associated with prosecution of [Petitioner's] claims and the parties [to the Agreement] agree all costs and fees shall be paid first out of any potential recovery whether such fees are owed on an hourly, flat fee, or contingency fee basis.

7 [and 8])[9] [Petitioner] relinquishes any and all claims to [shares of Sun River stock] issued pursuant to contractual agreements between [McMillan's consulting company] and [Sun River], including the liquidation value of any such shares during [the Case] . . .

9) [Petitioner] agrees that any recovery of [Sun River] stock shall be subject to a lock up agreement of six (6) month [sic] from the date of [the Agreement] and [Petitioner] may not sell more than 10% of the stock [Petitioner] may recover per month . . .

12) The parties [to the Agreement] agree that if there are no ongoing collection activities pending at the expiration of twelve (12) months from the [effective date of the Agreement] or at any point in time thereafter, [any party to the Agreement] shall have the right upon thirty (30) days written notice to terminate [the Agreement]. In the event of a termination, [Schmidt and Wafford] shall be entitled to recover reasonable and necessary attorney's fees expended prior to termination from any amounts [Petitioner] may collect under the Judgment after termination.

13) [Schmidt and Wafford] agree[] to provide monthly verbal and written quarterly updates on the [Case] to [Petitioner].

---

[9] Agreement ¶ 8 is identical to *id*. ¶ 7 except it refers to a different number of Sun River shares and a different entity with which McMillan was or is affiliated.

    14) [Schmidt and Wafford] agree[] to compel transfer agent [sic] to provide timely issuance of any and all stock certificates of [Sun River] secured by Judgment [sic] not subject to [Agreement ¶¶ 2-3].

    15) [Schmidt and Wafford] to [sic] obtain consent from [Petitioner] before accepting any settlement agreement with [McMillan].

    16) [Schmidt and Wafford] agree[] to use their best efforts in prosecuting the [Case].

    17) [Petitioner] agrees [Schmidt] is not acting as the attorney and [Petitioner] is not and will not rely [sic] upon legal advice from [Schmidt].

*D. The Petition*

Petitioner, in accordance with Agreement ¶ 2, filed the Petition on December 21, 2011 (the "Petition Date").[10] The Judgment and certain unpaid tax debts to the IRS comprised the overwhelming majority of McMillan's outstanding debt not subject to a bona fide dispute as to liability or amount[11] as of the Petition Date.[12]

McMillan accuses Petitioner of improperly using the Code as his first resort for collecting the Judgment. McMillan contends that Petitioner (1) has failed to prove that McMillan is "generally not paying [his undisputed] debts as such debts become due" as required by Code section 303(h)(1); (2) is disqualified from bringing the Petition by Rule 1003(a); and (3) filed the Petition in bad faith. Thus, argues McMillan, the Petition must be dismissed. The Counterclaim seeks costs, fees, and actual and punitive damages pursuant to Code section 303(i) in the event that the court dismisses the Petition.

---

[10] *See also supra* note 3.

[11] *See* Code § 303(h)(1). *See also* Section II.A. below.

[12] As will be explained in further detail below, the court need not describe McMillan's other debts. *See* Section II.A. below.

## II. DISCUSSION

This case presents three issues to the court. First, has Petitioner carried his burden under Code section 303(h)(1)? Second, did Petitioner commence this case in bad faith? Third, is Petitioner disqualified as a petitioning creditor under Rule 1003(a)?

### *A. Petitioner Carried His Burden Under Code Section 303(h)(1)*

Code section 303(h) provides:

> [A]fter trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—
>
> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . .

"[I]n determining whether an alleged debtor is generally not paying its debts as they become due," bankruptcy courts in this circuit generally "look to four factors: (1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the non-payments; and (4) the debtor's overall conduct in her financial affairs."[13]

In the case at bar, McMillan argues that the only debts on which he is not current are the Judgment and his taxes. Petitioner argues that McMillan has also not kept current on certain fees owed to attorneys.[14] Petitioner further argues that even if McMillan is otherwise current, his delinquency as to the Judgment is alone sufficient to satisfy Code section 303(h)(1).

---

[13] *In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[14] In fact, the evidence suggests McMillan is not paying most of his law firm creditors, though it is not clear that those debts are, in the view of their holders, past due.

Even assuming the only debt as to which McMillan is not current is the Judgment, the Judgment represents the overwhelming majority of McMillan's debt. Though the courts are not in agreement that, where, as here, an alleged debtor has few debts, a failure to satisfy an especially large one is sufficient to warrant relief under section 303,[15] the law applicable in this district is clear: an alleged debtor's failure to deal with a single, principal debt is sufficient to support a determination that the alleged debtor is not meeting its obligations as they come due.[16] McMillan's delinquency as to the Judgment is therefore sufficient to support a finding pursuant to Code section 303(h)(1) that McMillan is generally not paying his debts as they come due. The Case is therefore a proper involuntary proceeding in which the court could enter an order for relief.

### B. The Case Was Not Commenced in Bad Faith

Section 303(i) states:

---

[15] *Compare*, *e.g.*, *In re Euro-Am. Lodging Corp.*, 357 B.R. 700, 713 (Bankr. S.D.N.Y. 2007) ("The failure to pay just one significant creditor can support a finding that the debtor is generally not paying its debts." (citations omitted)) *with*, *e.g.*, *First Florida Nat'l Bank, N.A. v. Smith (In re Smith)*, 129 B.R. 262, 263 (M.D. Fla. 1991) ("[U]nder most circumstances, a debtor's failure to pay a single creditor will not justify the granting of an involuntary bankruptcy petition." (citations omitted)). *See generally* 2 COLLIER ON BANKRUPTCY ¶ 303.31[2], [4] (16th ed.).

Note, however, that courts holding that an "involuntary bankruptcy is appropriate" even "where the only unpaid debts are those of the petitioning creditors" generally require "the unpaid debt" to "constitute the majority of the overall debt." *Murrin v. Hanson (In re Murrin)*, 477 B.R. 99, 108 (D. Minn. 2012) (citations omitted). Given the relative size of the Judgment, representing almost 90% of McMillan's undisputed debt, *see Joint Pretrial Order*, docket no. 40, at 6-7, that condition is met here.

[16]   [T]he alleged debtor may not be "generally" paying his debts as they come due [within the meaning of Code section 303(h)] *when he is not paying one hundred percent of his debts to only one creditor*, or paying most of his debts in number to small recurring creditors, *but is not paying a few creditors that make up the bulk of his debts.*

*In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (citations omitted). *Accord Moss*, 249 B.R. at 422 (listing cases). *See also In re Vitro Asset Corp.*, No. 11-32600-HDH-11, 2012 WL 6021475, at *1-8 (Bankr. N.D. Tex. Dec. 4, 2012), *on remand from* No. 3:11–CV–2603–D (N.D. Tex. Aug. 28, 2012).

> (i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment . . .
>
>> (2) against any petitioner that filed the petition in bad faith, for--
>>> (A) any damages proximately caused by such filing; or
>>> (B) punitive damages.

McMillan counterclaims for damages, including punitive damages, under this provision.

Given the court's conclusion that Petitioner has satisfied the prerequisites set forth in Code section 303, a finding of bad faith would be inappropriate. Although courts in this circuit use a number of "different approaches for determining whether an involuntary petition was filed in bad faith for purposes of § 303(i)(2),"[17] Petitioner did not file the Petition in bad faith under any of these standards. Even though, for the reasons described below, Petitioner may be disqualified under Rule 1003(a),[18] bad faith is generally dependent upon a finding that the petitioner acted with wrongful motives and/or objectives.[19] There is no evidence in the record that *Petitioner* sought relief under section 303 for a purpose other than to cause McMillan's assets to be dedicated to satisfying his debts, including the Judgment.[20] Moreover, Petitioner

---

[17] *In re TRED Holdings, L.P.*, No. 10–40749, 2010 WL 3516171, at *7 n.7 (Bankr. E.D. Tex. Sept. 3, 2010). These approaches include "(a) an 'improper use test,' (b) an 'improper purpose test,' (c) an 'objective test,' which inquires into what a reasonable person would have believed, and (d) a 'Rule 9011 test,' which inquires into whether the petition: (i) was justified based upon a reasonable inquiry into the facts and the law; and (ii) was interposed for an improper purpose." *Id*. (citing *Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*, 209 F.3d 100, 105-06 (2d Cir. 2000)).

*See generally*, *e.g.*, Honorable David S. Kennedy et al., *The Involuntary Bankruptcy Process: A Study of the Relevant Statutory and Procedural Provisions and Related Matters*, 31 U. MEM. L. REV. 1, 51-53 (2000) (describing the various tests courts have devised and explaining that most approaches "use a combined objective and subjective analysis when addressing bad faith under section 303(i)(2) of the Code").

[18] *See* Section II.C. below.

[19] *In re Synergistic Techs., Inc.*, No. 07–31733–SGJ–7, 2007 WL 2264700, at *6-7 (Bankr. N.D. Tex. Aug. 6, 2007). *See also supra* note 17.

[20] This is not to say that Sun River, Schmidt, and Wafford did not act other than in good faith, but they are not petitioners and therefore are not before the court.

disclosed the Agreement and the transfer it effected to the court and the parties, *see Verified Notice Pursuant to [Rule] 1003(a) of Transfer of Claim*, docket no. 14, which further indicates that Petitioner harbored no wrongful purpose. Finally, and most importantly, because the Petition satisfies section 303(h)(1), Petitioner as a matter of law had sufficient basis to believe that involuntary relief was proper to avoid a finding of bad faith.

Courts are – and should be – hesitant to conclude that a litigant is attempting to abuse section 303, even where that litigant is ultimately unable to obtain involuntary relief from the court.[21] Accordingly, section 303(i) contains permissive language ("the court *may* grant judgment . . . against any petitioner that filed the petition in bad faith . . ." (emphasis added)) that vests the court with the discretion to award damages only where the court deems it necessary, such as to deter overt wrongdoing. Likewise, bankruptcy courts in this district have adopted "a presumption that the petitioning creditor[] acted in good faith in filing an involuntary petition."[22] In the absence of strong evidence that Petitioner acted willfully or wrongfully, the court cannot, need not, and will not award McMillan damages pursuant to section 303(i)(2).

Accordingly, the court concludes Petitioner did not bring the involuntary case in bad faith. To the extent that the Counterclaim seeks damages under section 303(i)(2), it must be dismissed.[23]

---

[21] *See* Lawrence Ponoroff, *The Limits of Good Faith Analyses: Unraveling and Redefining Bad Faith in Involuntary Bankruptcy Proceedings*, 71 NEB. L. REV. 209, 216-17, 301 (1992).

[22] *Synergistic Techs*, 2007 WL 2264700 at *6.

[23] McMillan may be entitled to relief under Code section 303(i)(1), which provides that the court may grant judgment "against the petitioners and in favor of the debtor for costs or a reasonable attorney's fee" (internal punctuation and section numbers omitted). The court need not address this issue at this juncture. Of course, any award under this provision would be susceptible to offset against the Judgment.

### C. *Petitioner is Disqualified Under Rule 1003(a)*

However, even if the Case is a proper involuntary proceeding under the Code, the court must still determine whether Petitioner is qualified to pursue involuntary relief under the Rules. Rule 1003(a) states:

> A transferor or transferee of a claim shall annex to the original and each copy of the petition a copy of all documents evidencing the transfer, whether transferred unconditionally, for security, or otherwise, and a signed statement that the claim was not transferred for the purpose of commencing the case and setting forth the consideration for and terms of the transfer. *An entity that has transferred or acquired a claim for the purpose of commencing a case for liquidation under chapter 7 or for reorganization under chapter 11 shall not be a qualified petitioner.* (Emphasis added).

Though alleged debtors most often utilize Rule 1003(a) to disqualify entities that *acquire* claims to serve as petitioning creditors,[24] Rule 1003(a)'s language is not so limited. Any transfer of a claim "for the purpose of commencing a[n involuntary] case" will fall within the prohibition of the rule.[25] Thus, if the Agreement transfers all or a part of the claim based on the Judgment from Petitioner to Schmidt and Wafford, and the transfer was for the purpose of commencing a bankruptcy case, then not only Schmidt and Wafford but also Petitioner (as one who has "transferred . . . a claim") are disqualified from acting as petitioning creditors in the Case.

There can be no question but that the Agreement was executed and implemented for the purpose of commencing an involuntary case against McMillan. To reiterate, Agreement ¶¶ 2-3 states:

---

[24] *See, e.g.*, *In re Oberle*, No. 06–41515, 2006 WL 3949174 (Bankr. N.D. Cal. 2006) (not intended for publication).

[25] The court need not here address whether the pledge of a claim to obtain funds to prosecute an involuntary case would fall afoul of Rule 1003(a), although the 1983 Advisory Committee Note to Rule 1003 suggests it would. In the instant case the court finds that Schmidt and Wafford sought out Petitioner with the goal of forcing McMillan into bankruptcy. The facts here are therefore far more compelling than where an innocent lender advances funds against the collateral of a judgment. *See also infra* note 27.

> 2) [Petitioner] agrees to file an involuntary bankruptcy action against [McMillan] under the [Code] and agrees to cooperate in the prosecution of the same . . .
>
> 3) The parties [to the Agreement] agree to jointly prosecute any claims they may have against [McMillan] in the [Case].

The remaining question, then, is whether the Agreement represents a transfer of all or part of Petitioner's claim.

Rule 9001 provides that the definitions contained in Code section 101 apply for construction of the Rules.[26] Code section 101(54) defines "transfer" as:

> (A) the creation of a lien;
>
> (B) the retention of title as a security interest;
>
> (C) the foreclosure of a debtor's equity of redemption; or
>
> (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—
>
>> (i) property; or
>> (ii) an interest in property.

Of the subparts of the definition, only section 101(54)(D) applies in the instant case. If the Agreement effects a "mode, direct or indirect, absolute or conditional . . . of disposing or parting with property; or an interest in property" – here, the Judgment and the claim which is based on it – then Petitioner has in fact "transferred . . . a claim for the purpose of commencing a case" and is disqualified as an involuntary petitioner.

For the following reasons, the court concludes that the Agreement effectuates a "transfer" that fits within the ambit of the Rule. First, by Agreement ¶ 6, Schmidt and Wafford agree to

---

[26] "The definitions of words and phrases in §§ 101, 902, 1101, and 1502 of the Code, and the rules of construction in § 102, govern their use in these rules." FED. R. BANKR. P. 9001.

pay the costs of pursuing the involuntary case against McMillan,[27] but that provision also entitles them to repayment of "all costs and fees . . . first out of any potential recovery." The Agreement therefore transfers to Schmidt and Wafford a monetary interest in Petitioner's claim.

Second, Petitioner relinquishes rights to recover from any Sun River stock that may be owned and/or liquidated through McMillan's estate. Agreement ¶¶ 7-9. This clearly constitutes "parting with" a potential property interest by Petitioner and therefore constitutes a "transfer."

Third, control over prosecution of the involuntary case against McMillan is largely ceded to Schmidt and Wafford. Agreement ¶ 4. Although the same provision gives Petitioner the right to settle his claims, *see id.*, given the limitations on settlement of a petitioner's claims in the involuntary bankruptcy context[28] and the claims apparently asserted by Sun River,[29] which is under the control of Schmidt and Wafford, this does not by any means represent unfettered control over the Judgment. Rather, Schmidt and Wafford have the power under the Agreement to force and maintain prosecution of the Case. The transfer of control is also a transfer of an interest in property.[30]

---

[27] Unlike a normal loan, which Petitioner might have sought to pursue McMillan and collateralized with the Judgment, Petitioner has no personal liability for amounts advanced under Agreement ¶ 6. In any event, the 1983 Advisory Committee Note to Rule 1003 suggests that a transfer of a claim for security – which this case effectively presents – would fall within the prohibition of Rule 1003(a). The court need not address whether a normal secured loan would indeed fall within the scope of the Rule.

[28] Section 303(i)(1) severely limits the ability of a petitioner to dismiss an involuntary case and so avoids use of involuntary petitions as debt collection tactics. *See, e.g., In re Exch. Network Corp.*, 85 B.R. 128, 133 (Bankr. D. Colo. 1988). *See also infra* note 32.

[29] Sun River is a listed creditor of McMillan that would have notice before dismissal of the involuntary case under section 303(i)(1). Thus, even if Petitioner is not precluded by Agreement ¶ 4 from seeking dismissal of this case, Sun River would be in a position to resist such a move.

[30] *See, e.g., Leucht v. Leucht (In re Leucht)*, 221 B.R. 1003, 1009 (Bankr. M.D. Fla. 1998) (citing S.Rep. No. 95–989, 95th Cong.2d Sess. 27 (1978), U.S.C.C.A.N. 1978, pp. 5787, 5813).

As a result, Petitioner is disqualified from bringing the Petition. There are accordingly no qualified petitioning creditors remaining in the Case,[31] so the Case must be dismissed.

It makes good sense that an arrangement such as that evidenced by the Agreement should be disfavored. Sun River, Schmidt, and Wafford have numerous complaints against McMillan. Whether or not they are valid, the bankruptcy court should not provide a battlefield for their war or a weapon for winning it. Section 303 of the Code and Rule 1003(a) are intended to inhibit the use of involuntary bankruptcy as a tactic for debt collection or as a cudgel in a broader dispute.[32] Where, as here, the true prime mover for involuntary relief – Sun River – has interests that the Code and Rules were not intended to protect, it would be inappropriate for the court to allow itself to be used as another front in the Sun River-McMillan war.

### III. CONCLUSION

For the foregoing reasons, the Petition will be dismissed and the Counterclaim denied to the extent consistent with this opinion. The court will retain jurisdiction to determine any costs or fees to be awarded to McMillan under Code section 303(i)(1). McMillan's counsel is directed to prepare and submit a judgment accordingly.

### ### END OF ORDER ###

---

[31] *See supra* note 3.

[32] *See* Ponoroff, *supra* note 21, at 212-15 (describing the history and intent of section 303). *See also*, *e.g.*, *MAG Bus. Servs. v. Whiteside (In re Whiteside)*, 240 B.R. 762, 766 (Bankr. W.D. Mo. 1999); Timothy Bow, *Involuntary Petitions: Bad-Faith Motives and High Risks*, 31-AUG AM. BANKR. INST. J. 52, 52 (2012).